UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

LATARA HARRIS,

     Plaintiff,

v.                                                            Case No. 3:22cv23351-TKW-HTC

BATH & BODY WORKS, LLC,

     Defendant.

_____/

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Latara Harris sues Defendant Bath & Body Works, LLC, under 42 U.S.C. § 1981, alleging Defendant refused to allow her to exchange candles she bought online with candles in a store because of her race. Before the Court is Defendant's motion for summary judgment. ECF Docs. 38 & 39. Plaintiff responded in opposition, ECF Doc. 42, and Defendant filed a reply, ECF Docs. 43 & 44. After reviewing the parties' submissions, the record, and the relevant law, the undersigned recommends Defendant's motion for summary judgment be granted, as a reasonable jury could not find Defendant's failure to process the exchange was due to racial discrimination.

## I.    **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* The Court must review the evidence, and all factual inferences reasonably drawn from the evidence, "in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993) (citation omitted). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted).

## II.    Statement of Undisputed Facts[1]

1.    Defendant sells home fragrance products, like scented candles, and personal care products to the public via the internet and in retail stores. ECF Doc. 4 at ¶ 6.

---

[1] The following facts are taken from evidence submitted by the parties, including deposition testimony, audio recordings, and video recordings. Where the facts are disputed, the disputes are noted.

2.      On June 28, 2022, Plaintiff, an African-American woman, purchased seven scented candles from Defendant's website at a discounted price of $6.62 per candle (the regular price of the candles was $26.50).  ECF Docs. 38-30, 43-4.

3.      On July 16, 2022, Plaintiff and her daughter, Sincere Harris, brought the candles to Defendant's retail store in the Cordova Mall in Pensacola, Florida, to exchange them for candles sold in the store.  ECF Doc. 38-1 at 14:6-24; 15:16-22. They entered the store at approximately 2:15 p.m., and Plaintiff told an employee named Ronnie Faria, whom Plaintiff had interacted with on prior occasions at the store, she wanted to exchange the candles for other candles sold in the store.  ECF Doc. 38-1 at 17:23 – 18:11; ECF Docs. 38-26, 38-28 (store camera footage).

4.      Faria took Plaintiff to browse some of the store candles and placed the online candles, along with the receipt behind the cashier counter.  ECF Doc. 38-1 at 18:11-19; ECF Doc. 38-28 (store camera footage).

5.      When Plaintiff selected store candles that were priced higher than the candles she purchased online, she was informed by Assistant Store Manager Stephanie Oberhausen the store would not complete the exchange, but it would give her a refund.  ECF Doc. 38-1 at 19:15-23, 21:8-16; ECF Doc. 38-3 at 13:19 – 14:13.[2]

---

[2] Plaintiff testified an unknown employee was the first to indicate the exchange could not be made, while Plaintiff's daughter testified Oberhausen was the first such employee.  The video evidence indicates Oberhausen was the first employee to speak to Plaintiff after Faria.  ECF Docs. 38-26 – 38-28.

Even though the price of the store candles was higher, Plaintiff explained she wanted to make an "even exchange"—an item-for item exchange—and insisted she had been allowed to do this in the past.  ECF Doc. 38-1 at 21:17 – 22:16, 45:13-16.

6.      Oberhausen advised Plaintiff that Defendant was implementing a new policy which allowed "price for price" exchanges but prohibited "item for item" exchanges.  ECF Doc. 38-1 at 21:17 – 22:16.  Although the new policy was not scheduled to begin until September 14, 2022, Oberhausen told Plaintiff "for you it's going to be today."  ECF Doc. 38-1 at 22:7-16.

7.      Unable to convince Oberhausen to make the exchange, Plaintiff told Oberhausen she was going to call Defendant's corporate office.  Before Plaintiff made those calls, Plaintiff alleges Oberhausen said, "Well, why don't you just want your money back?  Why -- why do you want a candle for candle?  This is what you people do.  You go online.  You find something cheap and then you try to exchange it for something more expensive."  ECF Doc. 38-1 at 27:7-18.  Plaintiff told Oberhausen that she perceived Oberhausen's use of the term "you people" as racist.  ECF Doc. 38-1 at 27:18-21.  (Defendant disputes Oberhausen used the phrase "you people" during this discussion).

8.      At some point, two other employees, Supervisor Tina Fletcher and Beverly Files Lane, also confirmed the policy, with Fletcher telling Plaintiff,

Oberhausen "is well within her right not to let you do this even exchange." ECF Doc. 38-1 at 84:10 – 86:17, 167:1-8; ECF Doc. 38-3 at 38:22 – 39:1.

9.    While still in the store, Plaintiff called Defendant's customer service center. ECF Docs. 38-10 – 38-12 (transcripts of customer service calls).[3] She spoke with Christine Wittman. Plaintiff told Wittman she had been "treated like trash" and the store was refusing to exchange the candles "because I paid $6 for it." ECF Doc. 38-10. Wittman offered Plaintiff a full refund of the money she paid for the candles online and to give her a $25 gift card. ECF Doc. 38-11. Plaintiff was unsatisfied with the offer, calling it a "bandage" that was "not going to be sufficient." *Id.* Plaintiff also told Wittman she was a paralegal, that she works for an attorney, and "if [she] wanted to get evidence that this is something that you guys are applying to me, I could get that just based on your store policy." *Id.*

10.    Also, at one point, Plaintiff directed her daughter to begin filming Oberhausen with her cell phone. ECF Doc. 38-29 (Sincere Harris recording). Oberhausen still refused to make the exchange, claiming it was not allowed under Defendant's policy. *Id.*; ECF Doc. 38-5 at 39:19-25.

11.    Oberhausen asked if she was being filmed, and after Plaintiff confirmed she was, Oberhausen used her wireless intercom to ask someone to call Defendant's

---

[3] Plaintiff says she is a Navy Federal Credit Union employee and based on her experience in customer service, knows the recordings Defendant produced have been altered. ECF Doc. 42-1 at 20. Plaintiff, however, has presented no evidence of any such alteration.

emergency operations center ("EOC").[4]  *Id.*; ECF Doc. 38-3 at 50:18 – 51:11.

Plaintiff then directed her daughter to stop filming.  ECF Doc. 38-29; ECF Doc. 38-

1 at 143:10-15.

12.    Oberhausen made the communication referencing the EOC sometime

between 2:36 and 2:48 p.m.  ECF Doc. 38-26 (store camera footage).  Plaintiff's

daughter asserts Faria subsequently advised her that for her own safety she should

leave the store.  ECF Doc. 38-3 at 21:12 – 22:8.  Plaintiff's daughter exits the store

with the box of candles at approximately 3:09 p.m.  ECF Doc. 38-26 (store camera

footage).  Plaintiff continues to browse around the store until she exits shortly after

3:24 p.m.  ECF Doc. 38-26 (store camera footage).

13.    Over the next few days, Plaintiff posted the video her daughter made

and a picture of Oberhausen on Defendant's Facebook page and other Facebook

pages, with comments such as "Meet [a] real racist Karen," referring to Oberhausen

as "an honorary member of [the] 'Karen gone wild' Klan," and accusing Oberhausen

of "call[ing] the popo."[5]  ECF Doc. 38-35.

---

[4] According to Senior HR Manager of Investigations Tiffany Brown, "a store can call the EOC
whenever they need advisement on what to do regardless of the situation. … [I]f it is about a safety
concern, if they need help understanding a policy, [the] EOC is staffed 24/7."  ECF Doc. 38-7 at
35:14 – 36:4.

[5] Although Plaintiff accused the store of calling the police, there is no evidence indicating the
police were called.  Plaintiff also posted that she "spoke with someone after leaving the store who
stated that they saw an exchange for a nonblack with no issue just moments earlier same scenario."
ECF Doc. 38-35 at 36.  Plaintiff admitted during her deposition that this was a lie.  ECF 38-1 at
71:25 – 72:25, 148:6-24.

14.     On July 17, 2022, Plaintiff called Defendant's customer service line and indicated she had a "racial discrimination complaint that needs to be handled with care."  ECF Doc. 38-13 at 9:12-14.

15.     After being made aware of Plaintiff's store visit, Defendant initiated an internal investigation.  ECF Doc. 38-7 at 33:22-34:20.  During this time, Defendant provided its employees at the Cordova Mall store with additional instructions regarding how to handle returns and exchanges; specifically, they were directed "to take back and exchange anything -- any and everything."  ECF Doc. 38-5 at 72:1-11.

16.     Also, after the incident, Plaintiff asked two of her daughter's "non-black friends" to attempt to make an exchange using the same candles Plaintiff had purchased.  (These two exchanges are discussed in more detail below).

## III.    Summary of the Argument

Plaintiff sues Defendant for race discrimination because one of their employees refused to allow her to exchange candles that were purchased on sale for $6.62 for candles in the store that were selling for a higher price.  As Plaintiff interprets Defendant's return policy, the price does not matter – she should be able to make a like-item exchange and has done so multiple times before.  Assuming for purposes of this motion, that Plaintiff's interpretation is correct, no reasonable jury would find, based on the evidence presented, that Plaintiff was denied the exchange

because of her race.  As discussed below, Plaintiff has presented no direct evidence of discrimination, and her circumstantial evidence does not pass the *McDonnell-Douglas* test.    At best, the evidence shows Defendant's employee was simply mistaken about the store's return policy.

## IV.    Discussion

Plaintiff alleges Defendant violated 42 U.S.C. § 1981, which "protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 475 (2006) (cleaned up) (citation omitted).  The phrase "'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."    42 U.S.C. § 1981(b).    To state a claim of race discrimination under § 1981, a plaintiff must establish: (1) that she is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute. *Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1171-72 (11th Cir. 2016); *see also Comcast Corp. v. Nat'l Assoc. of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020) ("To prevail, a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right.").  In other words, the statute "is not a general anti-discrimination

statute, but rather one requiring equal treatment when tied to some contractual relationship." *Gibson v. Graphic Packaging Int'l, Inc.*, 2017 WL 3444701, at *6 (E.D. Ark. Aug. 10, 2017).

### A.    Contractual Right

Plaintiff alleges that, based on Defendant's return policy, she was denied the contractual benefit of being able to return the online candles for the store candles – of being able to make a like-item exchange.  Attempts by consumers to return or exchange products may fall within the scope of 42 U.S.C. § 1981.  *See Singh v. Wal-Mart Stores, Inc.*, 1999 WL 374184, at *6 (E.D. Pa. June 10, 1999) ("A claim that a store refused because of race to accept an item for return or exchange to which a customer was contractually entitled, however, clearly involves the performance of a contract.").  Defendant, however, argues its return policy did not permit Plaintiff to exchange candles purchased online for more expensive store candles and, thus, Plaintiff cannot identify the impairment of a contractual relationship.

Plaintiff submitted an online order shipping receipt for a purchase she made on June 2, 2022, which contains a section titled "Returns & Exchanges in Store." ECF Doc. 38-33.[6]  That section states, with an original receipt:

---

[6] Plaintiff did not submit the shipping receipt for the June 28, 2022 purchase.  However, neither party disputes the June 28 receipt would have contained identical information.  *See* ECF Doc. 42-1 at 12 n.44 (stating the June 2, 2022 shipping receipt "discloses the defendant's true return and exchange policies"); ECF Doc. 39 at 20 n.65.

An exchange or credit will be issued for the purchase price on the original receipt (excluding shipping and handling charges). Ninety days or less from the original purchase date, credit card and PayPal purchases will be credited back to the original form of payment; thereafter, merchandise credit will be issued. All applicable promotions, discounts, offers, free items (as part of a qualifying purchase) and coupons granted at the time of purchase will be prorated and applied to the refund amount.

*Id.*

Plaintiff reads the phrase "[a]n exchange … will be issued for the purchase price on the original receipt" as permitting customers to exchange any item for any like item regardless of price difference, with the exchange being reflected on the exchange receipt as occurring at the purchase price of the original item. ECF Doc. 38-2 at 167:1-18. She bases this conclusion on the fact that Defendant's "Customer Policies" state that "[a]ll applicable promotions, discounts, offers, free items (as part of a qualifying purchase) and coupons granted at the time of purchase will be prorated and applied to the refund amount."[7] ECF Doc. 38-31. Plaintiff points to two exchange receipts given to her daughter's two friends showing the candles they exchanged, which were regularly priced at $26.50, were exchanged for $6.63 after the online promotion was applied. ECF Doc. 43-3.

---

[7] Plaintiff alleges Defendant altered the "Customer Policy" for discovery and claims she can tell when a document has been altered based on her experience as an employee of Navy Federal Credit Union. ECF Doc. 42-1 at 18. Plaintiff has provided no evidence of any such alteration.

Plaintiff also cites other evidence to support her interpretation of the exchange policy: (1) she testified she previously exchanged lower-priced items for higher-priced items, ECF Doc. 38-1 at 173:25 – 174:10; (2) after leaving Defendant's Cordova Mall store on July 16, 2022, she called several of Defendant's stores to ask whether she could make an item-for-item exchange,[8] Plaintiff Exhibits 42-26 – 42-29 (recordings of calls made to other stores); and (3) she testified she conducted a similar exchange in Defendant's Destin, Florida store on July 28, 2022, ECF Doc. 38-2 at 152:14 – 154:15.

Defendant disagrees with Plaintiff's interpretation of its refund/exchange policy. According to Defendant, exchanges are based on the purchase price of the products exchanged; the policy only permits customers to exchange an item for a like item with a value equal to the original item. Thus, Defendant argues Plaintiff's § 1981 claim must fail as a matter of law because Plaintiff had no contractual right (and thus was not deprived of one) to exchange a $6.62 candle for a more expensive candle, *regardless* of whether the items might have been the same.

Based on the evidence indicating exchanges like the one sought by Plaintiff on July 16 had been processed by at least some of Defendant's stores, the undersigned finds a genuine dispute of material fact exists regarding whether Plaintiff had a right to the requested exchange. That dispute, however, does not

---

[8] Plaintiff allegedly called 20 stores but recorded only 5 calls. ECF Doc. 42-1 at 13.

impact the Court's ability to enter summary judgment. Even viewing the policy liberally in favor of Plaintiff, as the non-moving party, and considering it as creating a contractual right for the return of the online candles for store candles, the Court finds Defendant is entitled to summary judgment.

## B.     Racial Discrimination

A plaintiff may prove racial discrimination through either direct or circumstantial evidence. If a plaintiff presents direct evidence that discrimination "played a significant or substantial role in the [challenged] decision, the burden shifts to the [defendant] to show that the decision would have been the same absent discrimination." *Eskra v. Provident Life & Accident Ins. Co.*, 125 F.3d 1406, 1411 (11th Cir. 1997). If a plaintiff relies on circumstantial evidence, then the court applies the burden-shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lee v. Russell Cnty. Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir. 1982) ("When a plaintiff proves a case of discrimination by direct evidence, the application of *McDonnell Douglas* is inappropriate).

### i.     Direct Evidence

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) (citation omitted). Here, the only evidence that could conceivably be considered direct evidence of

discrimination is Plaintiff's testimony that Oberhausen used the phrase "you people."[9]    However, the phrase "'you people' is not considered to be a racial epithet[.]" *Scott v. Thomas & King, Inc.*, 2010 WL 2630166, at *9-10 (S.D. Ohio June 28, 2010) ("the term 'you people' is commonly used in many contexts and, while offensive to some regardless of their race, cannot be said to specifically refer to race").

In *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990), the Eleventh Circuit considered whether a general manager's statement "that if it was his company he wouldn't hire any black people" and a production manager's statement "to a black employee that 'you people can't do a ———— thing right'" constitute direct evidence of discrimination. Although *Alton* is often mis-cited for the proposition that the term "you people" is direct evidence of discrimination, a careful reading of the court's opinion shows otherwise. While the court found "[the general manager]'s statement [that he would not hire black people] constituted direct evidence of discrimination," the court found the production manager's reference to "you people" "is the kind of stray remark contemplated by Justice O'Connor [in

---

[9] Although Plaintiff alleges a store employee told her daughter to leave "for your own safety," this is not direct evidence of discrimination.  Plaintiff and her daughter had already recorded their interactions with Oberhausen.  Thus, if store employees requested they leave, it could have as easily been based on their conduct as opposed to their race.  *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).  Furthermore, in a call with a customer service representative, Plaintiff states "no one ever asked me to leave the store."  ECF Doc. 38-17 at 6:24 – 7:3.

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)]," that is insufficient, standing alone, to qualify as direct evidence of discrimination. *Id.* at 924.

Therefore, even assuming Oberhausen used "you people" when talking to Plaintiff, it is not clear that she was referring to Plaintiff's race as opposed to, for example, people who buy things online or people who make exchanges. *See West v. AM/NS Calvert*, 350 F. Supp. 3d 1227, 1244-45 (S.D. Ala. 2018) (collecting cases where the context of the term "you people" was ambiguous and thus does not constitute direct evidence of discrimination). When the intent behind the alleged use of the phrase "you people" is ambiguous, it cannot constitute direct evidence of discrimination. *See id.*; *Miller v. Thomas Jefferson Univ. Hosp.*, 565 F. App'x 88, 93 (3d Cir. 2014) (finding "it unlikely that a single utterance of the phrase 'you people' suffices to establish a claim of racial discrimination" under 42 U.S.C. § 1981); *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) ("Evidence that only suggests discrimination … or that is subject to more than one interpretation … does not constitute direct evidence.") (citations omitted). The undersigned finds Plaintiff has not presented any direct evidence of discrimination.

### ii.    Comparators

For § 1981 claims based on circumstantial evidence, the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *See Tatum v. Jasper Water Works & Sewer Bd., Inc.*, 2023 WL 3720850,

at *2 (11th Cir. May 30, 2023) (citation omitted).  "To make a prima facie case of discrimination, the plaintiff must point to comparators of a different race who were 'similarly situated in all material respects.'"  *Id.* (quoting *Lewis v. City of Union City*, 918 F.3d 1213, 1229 (11th Cir. 2019)).

Shortly after the like-item exchange Plaintiff requested on July 16, 2022, was denied, Plaintiff and her daughter asked two of her daughter's white friends, Hilda Troche and Madison McNair, to attempt to make candle exchanges at the same location.  However, Plaintiff and the two proffered comparators were not "similarly situated in all material respects."  *See id.*

First, although Troche completed a candle for candle exchange at Defendant's Cordova Mall store on July 20, she testified the candles she returned and the candles she received were both priced at approximately $7.00.[10]  ECF Doc. 38-4 at 20:24 – 21:9, 22:15-18.  Because Troche did not attempt to exchange lower-priced candles for higher-priced candles, her experience and Plaintiff's experience are not comparable.  *See Lewis*, 918 F.3d at 1227 (noting a similarly situated comparator ordinarily "will have engaged in the same basic conduct … as the plaintiff").  Thus, Troche cannot serve as a valid comparator.

---

[10] Troche told staff she and her mother had purchased the candles she was trying to exchange on-line and admitted in her deposition that this was not a true statement.  ECF Doc. 38-4 at 12:17-19, 19:16-21.

Second, "two or three days" after the July 16 incident, the sales leadership team at the Cordova Mall store was directed "to take back and exchange anything – any and everything."[11]   ECF Doc. 38-5 at 72:1-11.   Because Troche and McNair made their exchanges under materially different circumstances, Plaintiff cannot use their experiences to establish a prima facie case of discrimination.   *See Lewis*, 918 F.3d at 1227 (noting a similarly situated comparator ordinarily "will have been subject to the same … policy, guideline, or rule as the plaintiff"); *Thomas v. Norfolk Southern Ry. Co.*, 2013 WL 791449, at *5 (N.D. Ill. Mar. 4, 2013) ("Cowgill is not a relevant comparator for Thomas's ADEA claim because Cowgill was not subject to the same policy as Thomas."); *cf. Pappas v. Town of Enfield*, 18 F. Supp. 3d 164, 183 (D. Conn. 2014) ("Temporal disparity may undermine a potential similarly situated comparator, because nondiscriminatory reasons, such as policy change or a intervening event, may explain the difference in treatment over time.").

Indeed, when McNair attempted to exchange lower-priced candles for higher-priced candles on July 21, the cashier initially refused to complete the transaction, citing the price difference and explaining Defendant's policy only allowed McNair to exchange the candles for something similarly priced.   ECF Doc. 38-6 at 19:5 – 20:6; 24:13-21.   McNair left the candles with the cashier, exited the store, and called

---

[11] Plaintiff argues "[t]his justification is clearly a retroactive coverup, to conceal discriminatory behavior, rather than a proactive solution." ECF Doc. 42-1 at 13.  Plaintiff, however, has presented no evidence to dispute that the store did in fact receive such instructions.

Plaintiff, who told McNair to retrieve the candles and leave. ECF Doc. 38-6 at 20:12-21. When McNair returned to the store, a manager approached McNair and told her the store typically would not make the exchange and would not do so in the future, but they would make an exception that day. ECF Doc. 38-6 at 20:25 – 21:9. The manager told the cashier how to complete the exchange, ECF Doc. 38-6 at 23:4-6, though the cashier "looked confused as to why the manager was letting [McNair] do this." ECF Doc. 38-6 at 21:15-16.

McNair's experience on July 21 does not support Plaintiff's claim of racial discrimination; instead, it shows the cashier initially described and applied the same exchange policy to a white customer as had been described and applied to Plaintiff. The sequence of events that followed—the manager's intervention, the manager's explanation that exchanges like this were not permitted and would not be permitted in the future but an "exception" would be made, and the cashier's confusion about why the exchange was being allowed—is consistent with the evidence indicating the sales leadership team was directed "to take back and exchange anything – any and everything." ECF Doc. 38-5 at 72:1-11. Thus, the circumstances surrounding McNair's July 21 exchange show she was not similarly situated in all material

respects with Plaintiff and, therefore, McNair cannot be considered a valid comparator.[12]

### iii.    Mosaic of Circumstantial Evidence

Although Plaintiff has failed to establish a *prima facie* case of discrimination through a comparator, she may also survive summary judgment by presenting a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.  *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019).  "A convincing mosaic may be established by pointing to evidence of (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated [customers], and (3) pretext."  *Tatum*, 2023 WL 3720850, at *2 n.4 (citing *Lewis*, 934 F.3d at 1185).

The undersigned concludes Plaintiff has not presented a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.

---

[12] Plaintiff also asserts she should have been allowed to complete the exchange on July 16, 2022, because her daughter completed a candle exchange on June 9, 2022.  However, Plaintiff's daughter is also African-American and, thus, she cannot be considered a comparator.  Furthermore, the receipt for the June 9 exchange merely shows two items priced at $15.00 being exchanged for two items also priced at $15.00, ECF Doc. 43-2, and there is no testimony indicating that exchange involved items that were priced differently.  In addition, Plaintiff testified she thought that exchange may have involved candles she received through the mail that were broken, which could implicate different considerations regarding whether to process an exchange.  ECF Doc. 38-1 at 25:13-22 ("I think those were the broken ones.  I think something came in the mail.  It was broken and they don't like for us to send it back, of course, Bath and Body, so they tell you to go to the store to -- with the broken item.").

First, even if Oberhausen failed to implement Defendant's policy correctly or wrongly believed she had the discretion to deny the requested exchange, that is insufficient to infer discrimination.[13] *See Dugan v. Albemarle Cnty. School Bd.*, 293 F.3d 716, 722 (4th Cir. 2002) ("Even if there is evidence that the [defendant] erroneously or even purposely misapplied the … policy, it is not proof of unlawful discrimination."); *cf. Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981.").

Second, as discussed above, Oberhausen's alleged use of the phrase "you people" is ambiguous and, in this context, not sufficient to show racial discrimination by Oberhausen. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d Cir. 2010) (expressing skepticism that loan officer's statements that "you people don't understand how the process works" and "you people don't understand the loan process" were, "alone, so revealing of discriminatory animus that it would enable a factfinder to conclude that a discriminatory attitude was, more

---

[13] In her response, Plaintiff asserts "all" the customer service representatives she spoke with while in the store "advised Oberhausen that the exchange should be permitted because it was within policy." ECF Doc. 42-1 at 4. However, in her deposition, Plaintiff testified the first customer service representative she spoke with on the phone said exchanges "had to be dollar for dollar, not item for item." ECF Doc. 38-1 at 32:22 – 33:3. Furthermore, when Plaintiff told Wittman "it sounds like your store is refusing to do something that you're advising them that they need to do," Wittman explicitly told Plaintiff "[p]lease don't put those words in my mouth" and "I cannot tell them what to do or not." ECF Doc. 38-12 at 3:6-19.

likely than not, a motivating factor in the decision to impose the challenged loan conditions"); *King v. E. Shore Water, LLC*, 2012 WL 3155647, at *13 (D. Md. July 31, 2012) ("[C]ourts have held that where the term 'you people' does not clearly and unambiguously refer to a minority group, it is not discriminatory.") (citations omitted); *Randall v. Intercontinental Exch., Inc.*, 2005 WL 8154303, at *16 (N.D. Ga. June 2, 2005), *report and recommendation adopted*, 2005 WL 8154287 (N.D. Ga. July 14, 2005) ("[T]o assume that Tullis meant to refer to plaintiff's race when he made the ['you people'] statements would constitute mere speculation. At best, plaintiff has presented a scintilla of evidence in her favor regarding bias, which is far from sufficient for a finding in her favor.").

Third, Plaintiff argues Oberhausen's act of calling Defendant's EOC was unjustified and represented an attempt to "weaponize" an emergency service against a minority.[14] However, Oberhausen had extensive interaction with Plaintiff and called the EOC only after learning Plaintiff's daughter was filming her. The evidence indicates Oberhausen told her staff to call the EOC because she was concerned she was "standing there being filmed with a name tag on" and she "did not know where this could go, who it could be distributed to, and in what manner."

---

[14] At the time, Plaintiff apparently believed Oberhausen had told her staff to call the "ECSO," the Escambia County Sheriff's Office. No law enforcement or security service ever arrived at the store, and Plaintiff remained in the store, on the phone with customer service and browsing products, for over thirty minutes after Oberhausen told her staff to call the EOC.

ECF Doc. 38-5 at 52:17-20.  The EOC call came well after Oberhausen declined to complete the candle exchange, and nothing regarding the EOC call suggests the denial of the candle exchange was caused by racial discrimination.[15]

Fourth, Plaintiff references an incident her daughter allegedly witnessed in June 2022 in the Cordova Mall store.  Her daughter testified she saw a black woman surrounded by three white female workers who "seemed upset," and made comments such as, "I don't understand," "I have done this before," and "Why can't I?"  ECF Doc. 38-3 at 76:22 – 77:11.  However, the description of this event is far too vague to shed any light on why Oberhausen declined to process Plaintiff's exchange on July 16, 2022.  The employees involved are not identified and there is no evidence regarding the factual circumstances that could have precipitated that customer/employee interaction.

---

[15] Plaintiff testified Wittman, one of the customer service representatives she spoke with on July 16, advised her to leave the store for her safety.  ECF Doc. 38-1 at 42:25 – 43:13.  The recording of that conversation contains no such statement.  Indeed, after Plaintiff advised Wittman she had been told to leave the store for her own safety, Wittman simply said "I think I'll have you leave the store and take your candles"; however, Plaintiff told Wittman, "I've already left the store."  ECF Doc. 38-12.  Nevertheless, Plaintiff alleges Defendant altered the recording of the conversation to remove Wittman's statement that Plaintiff needed to leave the store for her safety.  ECF Doc. 38-2 at 112:23 – 113:18.  However, Defendant has presented a declaration from the Director of Information Technology for Sitel Group, the company providing customer service for Defendant on July 16, 2022; the declaration states the recordings of Plaintiff's calls with Wittman "are authentic, true, correct and complete duplicates of the portions of the original NICE CX ONE digital records containing any communications between the person identifying herself on the recording as Latara Harris and the corresponding employee of Sitel."  ECF Doc. 38-9.  Plaintiff has produced no competent evidence to dispute the accuracy of the recordings.

Fifth, Plaintiff notes some of Defendant's employees viewed and commented on her social media posts regarding the July 16 incident, which she characterizes as "stalking." But it is undisputed Oberhausen never made any comments on social media regarding the incident. ECF Doc. 38-5 at 54:18-23. Thus, the social media posts do not show Oberhausen's refusal to complete the exchange was due to intentional discrimination. *See Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (noting the "convincing mosaic of circumstantial evidence" must "allow a jury to infer intentional discrimination *by the decisionmaker*") (emphasis added) (citation omitted).

Sixth, Plaintiff has not shown systematically better treatment of similarly situated customers. As previously discussed, the candle exchanges by Troche and McNair do not suggest the denial of Plaintiff's July 16 exchange was due to racial discrimination. In particular, McNair's experience shows Defendant initially intended to deny a white customer the same type of exchange.

Finally, Plaintiff has not shown Oberhausen's cited reason for refusing the exchange—that she did not believe customers were permitted to exchange less expensive items for more expensive items—was pretextual. Even if Oberhausen's subjective beliefs regarding the exchange policy were incorrect, that is not suggestive of intentional discrimination. *See DAG Petroleum Suppliers, L.L.C. v. BP P.L.C.*, 268 F. App'x 236, 242 (11th Cir. 2008) ("[P]retext is a lie or cover-up,

not merely a mistake. … [E]vidence that [a defendant] erroneously or even purposely misapplied its own policy, will not suffice to overcome summary judgment.") (cleaned up) (citations omitted).

Rather than constituting evidence of discrimination, what Plaintiff's proffered evidence shows is that Defendant's employees may not have understood Defendant's return/exchange policy. As Plaintiff acknowledges in her written submission, "[t]he policy was not uniformly applied to ALL customers." ECF Doc. 42-1 at 13 (emphasis in original). That lack of uniformity, however, appears to have had nothing to do with Plaintiff's race.

## V. Conclusion

Plaintiff has presented no more than a scintilla of evidence to support her claim of racial discrimination. "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250 (internal citations omitted).

Plaintiff's unpleasant experience on July 16, 2022, may have been caused by Oberhausen's flawed interpretation of Defendant's exchange policy or a failure to

adhere to the correct policy in the Cordova Mall store, but that alone is insufficient to show Plaintiff experienced racial discrimination, rather than perhaps simply poor or inconsistent customer service. *See Lopez v. Target Corp.*, 676 F.3d 1230, 1235 (11th Cir. 2012) ("As this Court has explained, § 1981 is not a general civility code.") (citation omitted). Because Plaintiff has not put forth evidence from which a reasonable jury could conclude racial discrimination was a but-for cause of the denial of the requested exchange, summary judgment should be entered in favor of Defendant.

Accordingly, it is RECOMMENDED:

1.    That Defendant's motion for summary judgment, ECF Doc. 39, be GRANTED.

2.    That judgment be entered in favor of Defendant and against Plaintiff.

At Pensacola, Florida, this 18th day of September, 2023.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1.